

ORIGINAL

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION



FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUN 2 0 2006

LUTHER D. THOMAS, Clerk
By _____ Deputy Clerk

STATE OF GEORGIA,

    Plaintiff,

v.

THE UNITED STATES ARMY
CORPS OF ENGINEERS, FRANCIS J.
HARVEY, in his official capacity as
Secretary of the United States Army;
JOHN P. WOODLEY, JR , in his
official capacity as Assistant Secretary
of the United States Army for Public
Works; LIEUTENANT GENERAL
CARL A STROCK, in his official
capacity as Commander and Chief of
Engineers, United States Army Corps of
Engineers, BRIGADIER GENERAL
MICHAEL J WALSH, in his official
capacity as Division Commander, South
Atlantic Division, United States Army
Corps of Engineers; and COLONEL
PETER F TAYLOR, JR , in his official
capacity as District Commander, Mobile
District, United States Army Corps of
Engineers,

    Defendants

Civil Action
File No _____ **1:06-CV-1473**

**CAP**



## **COMPLAINT**

Plaintiff, the State of Georgia, files this Complaint against the Defendants as follows:

## PARTIES

1

Plaintiff, the State of Georgia, brings this action in its own capacity based upon actual injury to its interests and in its representative capacity as parens patriae for the citizens of the State of Georgia based upon irreparable harm to the general welfare of the State and its citizens. The State has suffered legal and irreparable harm because of the agency action described in this Complaint.

2.

Defendant United States Army Corps of Engineers (the "Corps") is a branch of the United States Army under the direction and supervision of the Secretary of the United States Army and is an agency of the United States within the meaning of 5 U.S C § 701

3.

Defendant Francis J. Harvey ("Secretary Harvey") is the Secretary of the United States Army. Defendant John P Woodley, Jr ("Assistant Secretary Woodley") is the Assistant Secretary of the United States Army for Civil Works. Defendant Lieutenant General Carl A. Strock ("General Strock") is the

Commander and Chief of Engineers, United States Army Corps of Engineers.
Defendant Brigadier General Michael J. Walsh ("General Walsh") is the Division
Commander for the South Atlantic Division of the United States Army Corps of
Engineers  Defendant Colonel Peter F. Taylor, Jr. ("Colonel Taylor") is the
District Commander for the Mobile District of the United States Army Corps of
Engineers.

4

Secretary Harvey, Assistant Secretary Woodley, General Strock, General
Walsh, and Colonel Taylor, acting in their official capacities, individually or
collectively are responsible for and approved the acts and omissions of the Corps
alleged herein and are responsible for compliance by the Corps with any decree of
this Court.

## JURISDICTION AND VENUE

5

This Court has jurisdiction over this action pursuant to federal law, including
28 U S.C.A § 1331, 5 U S C.A. § 701 et seq., 28 U.S.C A § 2201 et seq., 43
U S C.A § 390b, and the Constitution of the United States of America.

3

6

Lake Lanier and the Chattahoochee River, two bodies of water at issue in this litigation, are physically located within the Atlanta Division of the Northern District of Georgia Defendant General Walsh resides within this District and Division, and a substantial part of the events and omissions giving rise to the claims asserted in this Complaint occurred in this District and in this Division

7

Venue in this Court is proper pursuant to 28 U.S C A. § 1391(e)(1) and (2) and Local Rule 3 1 of the Northern District of Georgia Court Rules.

## NATURE OF THE CLAIM

8.

This Complaint seeks judicial review of the Corps' issuance on March 7, 2006 of its "Interim Operations at Jim Woodruff Dam and Release to the Apalachicola River In Support of Listed Mussels and Gulf Sturgeon" (the "IOP"). The IOP, issued in connection with the Corps' initiation of formal consultation with the U.S. Fish and Wildlife Service ("FWS") under Section 7 of the Endangered Species Act ("ESA"), sets certain specific rules for the Corps' operation of the federal reservoirs in the Apalachicola-Chattahoochee-Flint

4

("ACF") River Basin for the purpose of providing sufficient flows for two mussels

species and the Gulf sturgeon ("the ACF Species")  The IOP, which involves

substantially higher releases from the federal reservoirs in the ACF River Basin

than have occurred in the past, is invalid because it involves the release of

substantially more water than is prudent, places the vital needs within the ACF

River Basin including federally protected species at risk, and was adopted without

considering all relevant factors and without following the procedures prescribed

for adoption of water control plans under applicable regulations.  Therefore, the

IOP is arbitrary and capricious; in excess of statutory jurisdiction, authority or

limitations; and without observance of procedure required by law

## **FACTUAL AND LEGAL BACKGROUND**

### **Georgia's Statutory Responsibility for Water Resources**

9.

Georgia has exercised dominion and control over its water resources since

its Statehood. Today, Georgia requires conservation of those resources and

carefully regulates water use.  For example, the Georgia Water Quality Control Act

reads as follows:

> The people of the State of Georgia are dependent upon
> the rivers, streams, lakes, and subsurface waters of the
> state for public and private water supply and for
> agricultural, industrial, and recreational uses  It is

5

therefore declared to be the policy of the State of Georgia that the water resources of the state shall be utilized prudently for the maximum benefit of the people, in order to restore and maintain a reasonable degree of purity in the waters of the state and an adequate supply of such waters, and to require where necessary reasonable usage of the waters of the state       To achieve this end, the government of the state shall assume responsibility for the quality and quantity of such water resources and the establishment and maintenance of a water quality and water quantity control program adequate for present needs and designed to care for the future needs of the state.

O.C.G.A. § 12-5-21(a).

## The ACF Basin

10.

The Chattahoochee River is one of the State of Georgia's most precious natural resources. The citizens of the State of Georgia rely upon the Chattahoochee River and the federal reservoirs constructed on it to meet vital needs of the citizens of the State of Georgia, including water supply, waste assimilation, recreation, and navigation, and to support the biological needs of a wide variety of species

11.

The Chattahoochee River rises in the Blue Ridge Mountains in northeastern Georgia and flows through Atlanta to the southwest until it turns south and forms, at its western bank, the border between the States of Georgia and Alabama. Along

6

the way, the Chattahoochee River runs through the Georgia towns and cities of

West Point, Columbus, and Fort Gaines. The Chattahoochee River joins the Flint

River at Lake Seminole at the Florida border. Upon crossing into Florida, the

Chattahoochee River becomes the Apalachicola River and empties into the

Apalachicola Bay in the Gulf of Mexico. The Chattahoochee River is part of what

is known as the ACF River Basin

12

Except north of Lake Lanier, the flow of the Chattahoochee River is

regulated by a series of dams   Lake Lanier, a Corps reservoir formed by Buford

Dam, is situated approximately thirty-five miles north of the City of Atlanta

Construction of Buford Dam and Lake Lanier began in approximately 1950 and

was substantially completed in 1957. Approximately 155 miles southwest of Lake

Lanier, the Chattahoochee River begins to form West Point Lake, a Corps reservoir

formed by West Point Dam. From there, it flows through several dams operated

by the Georgia Power Company before flowing into another Corps reservoir, Lake

Walter F  George (a.k a., Lake Eufala)   Farther south, the Chattahoochee River

forms Lake George A  Andrews, another Corps reservoir, then joins with the Flint

River at the Corps` Lake Seminole, the southernmost reservoir within the ACF

River Basin   The Chattahoochee River flows for a distance of 434 miles from the

7

Blue Ridge Mountains to Lake Seminole  Releases from Jim Woodruff Dam at

Lake Seminole discharge into the Apalachicola River.  The Apalachicola River

flows for approximately 106 miles from the dam to the Gulf of Mexico at

Apalachicola Bay.  Approximately 74% of the drainage area of the ACF Basin lies

within Georgia.

13

Lake Lanier is located near the headwaters of the Chattahoochee River, and

the flow in the Chattahoochee River into and from the Lake is small, particularly in

comparison with the much higher flows downstream in Middle and Southern

Georgia and in Florida

## Authorization and Purposes of ACF Reservoirs

14.

Congress authorized construction of reservoir projects for the ACF River

Basin System, including a reservoir or reservoirs on the Chattahoochee River to the

north of the City of Atlanta, in the Rivers and Harbors Act of 1945, Pub L. No

79-14, 59 Stat. 10 (the "1945 Act"), and the Rivers and Harbors Act of 1946, Pub.

L  No  79-525, 60 Stat. 634 (the "1946 Act").

The 1945 Act declares it

> to be the policy of Congress to recognize the interests
> and rights of the states in determining the development of

8

the watersheds within their borders and likewise their interests and rights in water utilization and control, as herein authorized to preserve and protect to the fullest possible extent established and potential uses, for all purposes, of the waters of the Nation's rivers; . . . and to limit the authorization and construction of navigation works to those in which a substantial benefit to navigation will be realized therefrom and which can be operated consistently with appropriate and economic use of the waters of such rivers by other users.

59 Stat. 10

15

The Corps of Engineers' Reports upon which Congressional authorization of what would become Lake Lanier was based stated and contemplated that a purpose and benefit of Lake Lanier would be to provide water supply to the metropolitan north Georgia region  Other purposes for constructing the reservoir included flood control, hydropower production, and navigation.

16.

In 1990, Congress passed the Water Resources Development Act of 1990, Pub. L. No. 101-640 (the "1990 Act"), which directed the Secretary of the Army to "conduct a study of the operations of reservoir projects which are under the jurisdiction of the Secretary" and "to identify the purposes for which each such project is authorized; and   . . to identify the purposes for which each such project is being operated."

9

17.

Pursuant to the 1990 Act, the Corps published the document entitled Authorized and Operating Purposes of Corps of Engineers Reservoirs, dated July 1992 and reprinted in 1994  In Authorized and Operating Purposes of Corps of Engineers Reservoirs, the Corps lists "Water Supply" as both an "authorized purpose" and an "operating purpose" of Lake Lanier

18

Corps Regulation ER 1110-2-240, which is codified in the Code of Federal Regulations at 33 C F R § 222.5, contains a list of Corps projects and lists municipal and industrial water supply, along with flood control, hydropower, navigation, and recreation as project purposes of Buford Dam and Lake Lanier

19.

Lakes West Point and Walter F. George are, like Lake Lanier, water storage reservoirs that were authorized by Congress to fulfill multiple project purposes. According to federal regulations, 33 C.F R § 222 5, the purposes for West Point include hydropower, navigation, municipal and industrial water supply, low flow augmentation, and recreation.  According to the same regulation, the purposes for Lake Walter F  George and Lake Seminole include navigation and hydropower.

**The Corps' Obligation to Properly Promulgate Water Control Plans**

20.

The Corps promulgated 33 C F R § 222 5, which "prescribes policies and procedures to be followed by the U.S. Army Corps of Engineers in carrying out water control management activities, including establishment of water control plans for Corps and non-Corps projects, as required by Federal laws and directives." 33 C F R § 222.5(a). These regulations apply to "all field operating activities having civil works responsibilities," 33 C F R § 222.5(b), including the Corps projects on the ACF River Basin System. 33 C F.R. § 222.5(o) & App E, South Atlantic Div.

21.

The Corps must prepare a water control plan for "reservoirs, locks and dams, reregulation and major control structures and interrelated systems to conform with objectives and specific provisions of authorizing legislation and applicable Corps of Engineers reports " 33 C F.R. § 222.5(f)(1)

22

"Water control plans include coordinated regulation schedules for project/system regulation and such additional provisions as may be required to collect, analyze and disseminate basic data, prepare detailed operating instructions,

assure project safety and carry out regulation of projects in an appropriate manner " 33 C F R. § 222.5(e)(1)

23.

"The term 'reservoir regulation schedule' refers to a compilation of operating criteria, guidelines, rule curves and specifications that govern basically the storage and release functions of a reservoir  In general, schedules indicate limiting rates of reservoir releases required during various seasons of the year to meet all functional objectives of the particular project, acting separately or in combination with other projects in a system "  33 C.F.R  § 222.5(e)(2)

24.

In developing a water control plan, the Corps sponsors public involvement activities "to appraise the general public of the water control plan."  33 C.F.R. § 222.5(g)(2)(ı)   When a new water control plan is developed or a water control plan is revised, the Corps is required to sponsor public involvement and public meetings.  33 C F R. § 222 5(g)(2)(ı)(A).  The Corps is also required to provide information to the public concerning proposed water control management decisions "at least 30 days in advance of a public meeting."  33 C F.R. § 222 5(g)(2)(ı)(C).

12

25.

"There cannot be a continuing or recurring deviation from approved water control plans  In the case of a continuing or recurring change, the water control plan must be changed and the required approval obtained from [Corps Headquarters]." Corps' Engineer Pamphlet (EP) 1165-2-1 (at 18-3 - 18-4) (July 30, 1999)

## NEPA

26.

The National Environmental Policy Act ("NEPA") requires a federal agency to perform an Environmental Impact Statement ("EIS") before it initiates any "major Federal action[] significantly affecting the quality of the human environment"  42 U S.C  § 4332(C).  An EIS is a "detailed statement by the responsible official" of the agency that discusses.

> (i)  the environmental impact of the proposed action;
>
> (ii) adverse environmental effects that cannot be avoided should the proposal be implemented;
>
> (iii) alternatives to the proposed action;
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

13

(v) any irreversible or irretrievable commitments of resources that would be involved in the proposed action should it be implemented

See 42 U.S.C. § 4332(C).

## The Corps' IOP

27

On January 31, 2006, the State of Florida filed a motion for a preliminary injunction against the Corps in the United States District Court for the Northern District of Alabama seeking to compel the Corps to engage in formal consultation with the FWS under Section 7 of the ESA concerning the impact of the Corps' operation of the ACF Reservoirs upon the ACF Species   In the motion, the State of Florida also sought to compel the Corps to operate the reservoirs to meet certain river flow levels, allegedly to protect the ACF Species.  Florida's motion ultimately was denied on April 17, 2006.  This Complaint arises from the Corps' overreaction and mismanagement in response to concerns about the ACF species.

14

28

In a March 7, 2006 letter from the Mobile District of the Corps to the FWS, the Corps requested the initiation of formal consultation pursuant to Section 7 of the ESA   A true and correct copy of the March 7, 2006 letter (without its voluminous attachments except for Enclosure 1, which is the IOP) is attached hereto as Exhibit A.

29.

In connection with the March 7, 2006 initiation of formal consultation, the Corps developed and issued the IOP and agreed to operate the ACF Reservoirs in accordance with the IOP.  In the March 7, 2006 letter, the Corps stated that the IOP would apply to the operation of the ACF Reservoirs "until additional formal consultation is completed in association with the update and revision of water control plans for the ACF system."  The Corps further stated. "These interim operations concentrate on operations and releases from Jim Woodruff Dam to the Apalachicola River, taking into consideration composite storage available in upstream reservoirs but not addressing detailed operations at the upstream reservoirs   Such detailed operations would be addressed during the future update of the existing water control plans for the ACF basin."

30

The IOP itself requires various releases from Jim Woodruff Dam for two periods. the spring (March through May) and the rest of the year (June through February). The releases that the Corps is required to make from Jim Woodruff Dam depend upon the amount of "Basin Inflow" – a defined term that is roughly equivalent to the amount of water that is flowing into the ACF Reservoirs In addition, the IOP prescribes certain "down ramping rates," which prohibit the Corps from reducing the river stage in the Apalachicola River more than a certain amount per day, even if the naturally-occurring Basin Inflows dropped more precipitously The specific rules under the IOP may be summarized as follows:

> During the months of March through May (a) when Basin Inflows are greater than or equal to 37,400 cubic feet per second (cfs), the Corps would release no less than 37,400 cfs from Woodruff, (b) when Basin Inflows are between 20,400 cfs and 37,400 cfs, the Corps would release between 70% and 90% of Basin Inflows, but not less than 20,400 cfs; and (c) when Basin Inflows are less than 20,400 cfs, the Corps would release 100% of Basin inflows, but not less than 5,000 cfs
>
> From June through February. (a) when Basin Inflows are greater than or equal to 37,400 cfs, the Corps would release no less than 37,400 cfs from Woodruff; (b) when Basin Inflows are between 8,000 cfs and 37,400 cfs, the Corps would release between 70% and 90% of Basin Inflows, but not less than 8,000 cfs; and (c) when Basin Inflows are less than 8,000 cfs, the Corps would release 100% of Basin inflows, but not less than 5,000 cfs.

> The protocol also set forth certain rules limiting the rates
> at which the Corps would ramp-down releases (between
> 25 and 1 foot per day, depending on the current release
> range) as Basin Inflows fall

### 31.

The Corps developed the IOP without any public input, opportunity for
public comment, or public hearings. The Corps first gave notice of the IOP by
issuing it in final form in the March 7, 2006 letter

### 32.

The Corps began applying the IOP to the operation of the ACF Reservoirs in
March 2006

### 33.

The State of Georgia began monitoring reservoirs levels, basin inflows, and
river flow as soon as the Corps announced the IOP

### 34

By April 2006, it became clear to the State of Georgia that the Corps'
continuing application of the IOP to the operation of the ACF Reservoirs could
have a devastating impact upon the ACF River Basin  As will be explained in
greater detail below, in the development and implementation of the IOP, the Corps
has made at least four serious errors  First, the Corps in developing the IOP had
not taken into account the potential for very dry weather, and 2006 has become one

17

of the driest years on record. Second, the release quotas of the IOP are simply too high, and require the Corps to release water that should be stored so that the Corps has the water to augment flows in the driest days of summer. Third, the Corps, for a variety of operational reasons not contemplated in the development of the IOP, has released far greater amounts of water than even required by the IOP. Finally, the Corps based its application (and, upon information and belief, development) of the IOP upon an erroneous measurement of the amount of water in Lake Lanier – because of a faulty gage, the Corps assumed that the inflow into Lake Lanier was significantly greater than it actually is, with the consequence that as of June 17, 2006, the Corps had released approximately 69,020 acre feet (22 5 billion gallons) of water more than it had planned in accordance with the IOP, lowering the reservoir 1 9 feet more than intended

35.

On May 5, 2006, Dr. Carol A. Couch, Director of the Environmental Protection Division of the State of Georgia, wrote Colonel Taylor of the Corps, and enclosed a May 5, 2006 memorandum authored by State of Georgia hydrologist Dr. Wei Zeng. A true and correct copy of the May 5, 2006 letter and the May 5, 2006 Zeng Memorandum are attached hereto as Exhibit B

36

In her May 5, 2006 letter, Dr. Couch explained that State of Georgia hydrologists had calculated that the Corps' continued application of the IOP to the ACF Reservoirs "could draw down the federal reservoirs in the ACF Basin to their lowest levels in 50 years and, even worse, could effectively empty them " Dr. Couch explained that the State had been monitoring basin inflows and that the climatic conditions appear to resemble year 2000 conditions – the driest year on record. Dr Couch, referencing the May 5, 2006 Memorandum by Dr. Zeng, concluded that the Corps' application of the IOP would have severe impacts upon the ACF River Basin, including potentially reducing the levels of Lakes Lanier, West Point and Walter F George (Eufala) to their lowest levels in history, and place Georgia's water supply, water quality and biological resources in jeopardy. Dr Couch further noted that it appeared that, despite these conditions, the Corps was releasing *more* water than even the IOP required

37

In a May 15, 2006 response to Dr. Couch's letter, the Corps acknowledged that it had on occasion released more water than the IOP required   A true and correct copy of the Corps' May 15, 2006 letter is attached hereto as Exhibit C. The

Corps further stated that it continued "to refine our operations within constraints of the Interim Operations Plan to make every effort to match releases to the basin inflows as called for in the plan," but "real world operations will not be a precise as conditions observed in a model simulation" The Corps further disagreed with Dr Zeng's modeling results, stating that its own analysis "shows a much less severe impact to system lake levels" The Corps did not, however, disclose its modeling results or describe the actual impact to system lake levels that it was projecting

38.

Throughout May and into June, the Corps continued to apply the IOP to the ACF Reservoir operations and continued to release more water than the IOP required. Despite repeated requests, the Corps refused to adjust its operations to mitigate the negative impact of the IOP or to reconsider the flow requirements described in the IOP.

39

On June 1, 2006, Dr Couch sent a letter to the Corps and the FWS requesting that (1) the Corps thoroughly reconsider the IOP in light of the State of Georgia's finding that the IOP is unsustainable and threatens vital needs within the ACF Basin including those of endangered species, (2) pending the Corps' replacement of the IOP with an alternative reservoir operation plan, the Corps

20

immediately undertake measures that the State of Georgia had identified to mitigate the negative effects of the IOP, and (3) the Corps and the FWS extend the ESA formal consultation so that they would have the opportunity to consider the best scientific and commercial data on the endangered species at issue and the hydrologic data showing the sustainability of the IOP for meeting endangered species and other vital needs   A true and correct copy of Dr. Couch's June 1, 2006 letter is attached hereto as Exhibit D

40.

On June 2, 2006, the Governor of the State of Georgia Sonny Perdue wrote Secretary Harvey.  A true and correct copy of Governor Perdue's letter is attached hereto as Exhibit E.  In the letter, Governor Perdue emphasized Georgia's concern that "unless the Corps changes its operating protocols, the reservoirs and lakes in the system will be drawn down to their lowest level in recorded history."

41.

Also on June 2, 2006, Dr  Couch sent a letter to Colonel Taylor and FWS with an attached memorandum dated June 1, 2006 by Dr. Zeng, providing additional results of the simulation of the IOP using data and information received from the Corps.  A true and correct copy of Dr  Couch's June 2, 2006 letter is attached hereto as Exhibit F.  The letter states that "Each of the remaining four

21

simulations show the same pattern of devastating and unsustainable loss of storage

with reservoirs reaching the bottom of pools and staying there for prolonged

periods," with serious impacts on water supply and quality, hydropower, and fish

in the reservoirs

42.

On June 9, 2006, the State of Georgia had received no material responses

from the Corps to its letters. Accordingly, on June 9, 2006, Dr Couch wrote the

Corps another letter demanding specific revisions to the IOP. A true and correct

copy of the June 9, 2006 letter is attached hereto as Exhibit G. Specifically, Dr.

Couch requested that the Corps take the following actions by the close of business

on Monday, June 12, 2006

> 1    When basin inflows are greater than or equal to
> 8,000 cfs, the releases from Jim Woodruff dam should be
> 8,000 cfs until all federal reservoirs on the Chattahoochee
> River are refilled to the top of conservation storage
>
> 2.    When basin inflows are less than 8,000 cfs, the
> Corps should release 5,000 cfs from Jim Woodruff Dam
>
> 3    With each individual reservoir, releases should not
> exceed inflow for that reservoir, except when releases are
> necessary to augment flows to maintain 5,000 cfs.

43.

On June 12, 2006, the Corps responded by letter to Dr. Couch's June 1 and

June 2 letters. A true and correct copy of the Corps' June 12, 2006 letter is

attached hereto as Exhibit H   The Corps challenged what it believed to be certain

of the assumptions underlying Georgia's simulations of the IOP, but the Corps did

not provide sufficient data to allow Georgia to assess the validity of the Corps'

assertions or to fully evaluate discrepancies between the Corps' and Georgia's

models.

44.

On June 12, 2006, the Corps also informed the State of Georgia that it was

not prepared to respond to the June 9, 2006 letter, but that it intended to issue a

response by the close of business on Wednesday, June 14, 2006   A true and

correct copy of the Corps' June 12, 2006 letter is attached hereto as Exhibit I.  On

Wednesday, June 14, 2006, the Corps informed the State of Georgia that it was not

prepared to answer the June 9, 2006 letter, but that it intended to issue a response

by the end of the week, that is, by Friday, June 16, 2006.  Late in the afternoon on

June 16, 2006, the Corps stated that it would not respond to the June 9, 2006 letter

because of unidentified concerns raised by the other parties to the litigation

pending in the Northern District of Alabama   As of the filing of this Complaint,

the Corps has not responded to the State of Georgia's June 9, 2006 letter.

45.

Separately, in a letter to the FWS dated June 12, 2006, the Corps informed

the FWS that it was making certain revisions to the IOP   A true and correct copy

of the June 12, 2006 letter and revised IOP are attached hereto as Exhibit J   The

revised IOP leaves substantial discretion to the Corps to continue releasing far

more water than prudent given this dry season and far more than necessary to

protect the ACF Species.  Upon information and belief, the Corps is not currently

operating under the revised IOP

46

On Saturday, June 17, 2006, the Corps informed Georgia, Alabama and

Florida of a major error in its reporting of the water level in Lake Lanier.  The

Corps' gage had reported a level of 1067.62 feet, when in reality the level was

1065 72 feet.  Because of this error, the Corps released approximately 22.5 billion

gallons (6% of Lake Lanier's conservation pool) more from Lake Lanier than the

Corps thought it had (or the IOP required), above and beyond the over-releases

described above

47

As a result of the Corps' application of the IOP, from March 15, 2006 to June 20, 2006, the amount of water stored in the ACF reservoir system has dropped precipitously. If the dry weather continues, as is anticipated, the federal reservoirs in the ACF River Basin will drop to their lowest level in recorded history, and the Corps will be unable to meet the flow requirements of the IOP for the dry summer months, causing the flows in the Apalachicola River to reach historical low flows. Moreover, under the IOP, the Corps is unable to store a substantial percentage of the inflows in the event of substantial periodic rains during an otherwise dry season – storage that could benefit the system and the ACF Species

48.

Continued operation under the IOP under the current and projected drought conditions also threatens Georgia's water supply and waste assimilation needs, and imperils the Corps' ability to meet project purposes of the federal reservoirs now and in the future

## CLAIM FOR RELIEF

### Administrative Procedure Act:
### Judicial Review of Interim Operations Plan

49.

The State of Georgia incorporates by reference paragraphs 1 through 48.

50

The Corps' adoption of the IOP on or about March 7, 2006 constituted final agency action reviewable under the Administrative Procedure Act, 5 U.S.C § 701 et seq.  If the Corps has adopted and is operating under the revised IOP, that, too, is a final agency action.

51.

The State of Georgia, having the sovereign duty to protect the natural resources of the State, including water, has standing to bring this action challenging the Corps' adoption of the IOP, and the Corps' adoption of the IOP has caused actual injury to litigable interests of the State of Georgia

52.

All conditions precedent to the bringing of this action, including the exhaustion of any administrative remedies, have been satisfied

53

The Corps' adoption of the IOP was arbitrary, capricious and contrary to law and should be set aside

54

In adopting the IOP, the Corps failed to consider facts that are critical to the development of appropriate operational rules for the ACF Reservoirs, including the possibility of very dry or drought conditions and the critical need to store water that is not required to maintain flows for the ACF Species.

55

In adopting the IOP, the Corps failed to consider the multi-year impact of the IOP upon reservoir levels in the ACF River Basin

56.

In adopting the IOP, the Corps relied on incorrect data or assumptions.

57

The Corps has failed to comply with the requirements set forth in the IOP, releasing greater levels of water than required by the IOP.

58.

In addition, in support of its restriction on "down ramping," the Corps in the IOP states. "Apalachicola River fall rates of greater than 0.5 ft/day were extremely

27

rare prior to construction of the Corps ACF projects (analysis of gage records from the 1920s to the present), except during flood pulses." In fact, fall rates of greater than 5 feet per day were not uncommon, with the natural variation in inflows to the basin accounting for such decreases in the river stage regularly In addition, without any manipulation of the river flow by storage or release of water from the ACF Reservoirs, fall rates of greater than 5 feet per day this year would have been frequent because of natural variations in inflows into the ACF River Basin.

59

In developing and applying the IOP, the Corps relied upon a gage that it now admits had over-stated the depth of Lake Lanier Upon information and belief, the Corps used this faulty Lake Lanier level in its development of the IOP

60.

In adopting the IOP for the ACF System, the Corps failed to follow proper procedures in that it did not sponsor public involvement or public meetings.

61

The IOP is "major Federal action[] significantly affecting the quality of the human environment" within the meeting with NEPA. The Corps failed to prepare an EIS or otherwise comply with NEPA in conjunction with the IOP. Therefore, the Corps violated NEPA

28

62.

The IOP should be held unlawful and set aside because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), and "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

63.

The Corps' adoption and application of the IOP has caused the State of Georgia actual and substantial injury by reducing the amount of water stored in the ACF Reservoirs in Georgia far below levels that are prudent at this time of the year and levels that threaten the ability of this resource to meet the State's needs

64.

The IOP is having immediate adverse, irreparable consequences requiring injunctive relief that prohibits the Corps from continuing to operate under the IOP.

65

The revised IOP suffers from substantially the same defects as the IOP

66.

As a result of the foregoing, the State of Georgia is entitled to an order setting aside the IOP as arbitrary, capricious and in violation of law

WHEREFORE, the State of Georgia prays that this Court.

A.    Issue an order setting aside the IOP,

B.    Issue an order enjoining the Corps from continuing to operate in

accordance with the IOP or the revised IOP;

C    Grant the State of Georgia appropriate interim injunctive relief to

protect Georgia from irreparable harm pending the outcome of this litigation,

D    Award the State of Georgia attorneys fees and costs; and

E.    Award such other further relief as the Court may deem just and proper

to protect the interests of Plaintiff and the citizens of Georgia

Respectfully submitted this 20th day of June, 2006.

THURBERT E. BAKER
GA Bar No. 033887
Attorney General

ROBERT S. BOMAR
GA Bar No. 066400
Deputy Attorney General

ISAAC BYRD
GA Bar No 101150
Deputy Attorney General

Clay C. Long
Georgia Bar No 457000
Bruce P. Brown
Georgia Bar No 064460
R Todd Silliman
Georgia Bar No. 646005

McKenna Long & Aldridge, LLP

30

303 Peachtree Street, N.E.,
Suite 5300
Atlanta, Georgia 30308
(404) 527-4000
(404) 527-4198 (Fax)

ATTORNEYS FOR THE STATE OF
GEORGIA